UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Select Comfort Corporation

       Plaintiff,

v.

Arrowood Indemnity Company,            No. 13-cv-2975 (JNE/FLN)
                                                  ORDER
       Defendant/Third-Party Plaintiff,

v.

American Family Mutual Insurance Company,
St. Paul Mercury Insurance Company,

       Third-Party Defendants.

---

      This case is currently before the Court on two motions brought by Plaintiff Select Comfort Corporation against Defendant Arrowood Indemnity Company: first, a motion to exclude certain opinions of Arrowood's expert, John Pierce; and second, a motion for summary judgment on Arrowood's counterclaim.

      For the reasons discussed below, Select Comfort's motion regarding Pierce is denied and its summary judgment motion is granted.

**Background**

      As the Court has previously recited, *see* Order of Aug. 26, 2014 at 2-7, ECF No. 140, this is an insurance coverage dispute between Select Comfort, maker of the Sleep Number bed, and Arrowood, the insurance company from which it purchased two commercial general liability ("CGL") policies for the years 2001-02 and 2002-03.

The underlying case giving rise to this action, referred to here as the *Stearns* suit, was brought against Select Comfort as a putative class action in California in 2008. The suit included claims by several co-plaintiffs who alleged that they had suffered health problems from mold in the Sleep Number beds they had purchased over roughly the last two decades. Select Comfort tendered its defense in the matter to several insurers with whom it held liability policies during the time period implicated by the claims. Among those insurers was Arrowood, which accepted Select Comfort's tender with a reservation of rights.

Select Comfort took the position that Arrowood's reservation of rights created a conflict of interest in the defense of the *Stearns* action, thereby converting Arrowood's obligation to defend Select Comfort into an obligation to pay Select Comfort for the reasonable attorney's fees and costs it incurred in defending itself.[1] Accordingly, Select Comfort rebuffed Arrowood's plan to select defense counsel for the *Stearns* matter and retained counsel of its own choosing from the law firm of Oppenheimer Wolff & Donnelly, with attorneys from the firm of Pillsbury Winthrop Shaw Pittman serving as local counsel.

The *Stearns* litigation proceeded over the next several years. In those proceedings, Select Comfort successfully resisted class certification, after which a settlement was reached with the individual co-plaintiffs. During the mediation that produced the settlement, Arrowood agreed to pay 33% of the total, with Select Comfort paying the remaining 67%.

As for attorney's fees and costs, all told, Oppenheimer and Pillsbury Winthrop invoiced a total of just over $1 million for the *Stearns* defense. Arrowood and two other of Select Comfort's insurers paid roughly half of that amount, while Select Comfort paid the balance to the firms.

---

[1] The Court has previously granted partial summary judgment to Select Comfort on this issue. Order of Aug. 26, 2014, ECF No. 140

The year after the *Stearns* case settled, Select Comfort commenced this action against Arrowood, seeking to recover from it the approximately $500,000 in defense costs that the insurers had left uncovered. Arrowood, in turn, asserted a counterclaim against Select Comfort for "reimbursement" of an amount that it believes it "overpaid" towards the *Stearns* settlement. Arrowood also asserted third-party claims against other of Select Comfort's insurers for contribution, both with respect to defense costs and indemnification.

## Discussion

The Court considers Select Comfort's two motions in turn.

### I.   *Daubert* motion.

First, Select Comfort has filed a *Daubert* motion seeking to exclude Opinion 4-A of John Pierce. Arrowood intends to offer Pierce as an expert on the "reasonableness and necessity" of the attorney's fees and costs that Select Comfort incurred in the defense of the *Stearns* action, which Select Comfort claims Arrowood is obligated to pay under the terms of the two CGL policies.

As the proponent of Pierce's testimony, Arrowood bears the burden of establishing its admissibility by a preponderance of the evidence. *E.g., Lauzon v. Senco Products, Inc*., 270 F.3d 681, 686 (8th Cir. 2001). Federal Rule of Evidence 702 governs the admissibility of expert testimony. It reads:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

> **(b)** the testimony is based on sufficient facts or data;
> **(c)** the testimony is the product of reliable principles and methods; and
> **(d)** the expert has reliably applied the principles and methods to the facts of the case.

Under this rule, the district court plays the role of "gatekeeper," screening expert testimony to ensure that it is relevant, reliable, and offered by a witness who is "qualified to assist the finder of fact." *Lauzon*, 270 F.3d at 686.

Select Comfort does not contest Pierce's qualifications as an expert in the area of legal billing. It does, however, challenge the "fit" between a portion of Pierce's proposed testimony – his Opinion 4-A – and the "facts" of the case. *See Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000) ("If a party believes that an expert opinion has not considered all of the relevant facts, an objection to its admission is appropriate.").

Under the heading of Opinion 4-A, Pierce opines in his report that Oppenheimer and Pillsbury Winthrop's practice of "block-billing" for certain portions of the work they did in the *Stearns* action resulted in those firms invoicing an unreasonable amount for the defense they provided to Select Comfort.

As Pierce explains it, block-billing is "the practice of 'lumping' two or more tasks into a single billing entry for which the total amount of time for all tasks is indicated." Pierce believes that the "[t]ime spent on *each* separate task performed by an attorney should be separately recorded" so that "[t]he client, a third party and/or the court" can assess the reasonableness of the fees on a task-by-task basis. Because the "lumping" of tasks hinders such an evaluation, Pierce

> agree[s] with those California and federal courts that have found block-billing to be an *inflationary* billing practice warranting an across-the-board percentage reduction between 10% and 30% for block-billed fees. While I do not believe that the use of block-billing warrants a complete denial of all fees associated with block-billing, I agree that it warrants a percentage reduction. Accordingly, I have reduced the sum of all block-billed entries over one hour and not otherwise

> questioned by me by 25% and have thus identified a total of $93,325.40 in Oppenheimer's legal fees [out of a total of $394,133.75 in total block-billed fees by Oppenheimer] as unreasonable. . . . Correspondingly, I have given the Oppenheimer firm credit for 75% or $279,976.21 of such billing entries. My deduction for block-billed fees for Pillsbury Winthrop is $4,217.13 [out of a total of $22,477.00 in block-billed fees] and I have similarly given the firm credit for 75% of their block-billed fees.

Select Comfort objects to the admissibility of this opinion on the ground that Pierce, according to his own deposition testimony, did not take into account that Arrowood paid some of the Oppenheimer and Pillsbury Winthrop invoices containing block-billing during the course of the *Stearns* litigation. In Select Comfort's view, the evidence that Arrowood paid those invoices – rather than, for example, rejecting them and demanding task-by-task billing – undermines the opinion that Pierce proposes to offer on Arrowood's behalf that block-billing is categorically an inflationary billing practice.

For its part, Arrowood contests Select Comfort's characterization of the facts, offering evidence of its own to show that it actually did request task-by-task billing from Oppenheimer and Pillsbury Winthrop during the *Stearns* litigation. Arrowood contends that the evidence demonstrates that those firms ignored that request and, in the position Arrowood was in at the time, it would have been "futile" to do anything other than pay the invoices with which it was presented.

Of course, a *Daubert* motion is not the proper forum in which to resolve this factual dispute regarding the circumstances in which Arrowood paid the invoices. The question here is only whether Pierce's failure to consider what evidence there is on this subject renders his opinion inadmissible.

It does not. The Eighth Circuit has stated that, "[a]s a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the

5

opposing party to examine the factual basis for the opinion in cross-examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *Bonner v. ISP Technologies, Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001) (quoting *Hose v. Chicago Northwestern Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1996)). Pierce's opinion on block-billing is not so fundamentally unsupported that it would not assist the jury in assessing the reasonableness of Oppenheimer and Pillsbury Winthrop's invoiced fees.

The issue that Select Comfort raises regarding the information Pierce considered when forming his opinion is not terribly complex or technical. There is no need "to be overly pessimistic about the capabilities of the jury and of the adversary system generally. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. With Select Comfort's opportunity to cross-examine Pierce on the factual basis of his opinion – as well as to present to the jury the argument it presses here – there is no concern that the probative value of his testimony would be substantially outweighed by the danger of confusing the issues or misleading the jury. *Id.* at 595 (directing "a judge assessing a proffer of expert scientific testimony under Rule 702 [to] be mindful of other applicable rules," including Rule 403).

In sum, even as Arrowood concedes that it paid some of Oppenheimer and Pillsbury Winthrop's block-billed invoices, it remains the jury's prerogative to resolve the parties' dispute over why Arrowood did so. Depending on the facts that the jury finds with respect to that question, it could reasonably decide either to accept or reject Select Comfort's argument that Arrowood's payment of the invoices is inconsistent with Pierce's opinion that Oppenheimer and Pillsbury Winthrop's block-billing generated or masks unreasonable fees. In these

circumstances, it would be not be appropriate for the Court to take that decision away from the jury.

Select Comfort's motion to exclude Pierce's Opinion 4-A is therefore denied.

## II.     Summary judgment motion.

In addition to its *Daubert* motion, Select Comfort has moved for summary judgment on Arrowood's counterclaim. In its Amended Answer, Arrowood asserts that "Minnesota law follows a pro rata time on the risk allocation scheme for insurance coverage indemnity for claims which occur over a long period of time." According to Arrowood, "the allegations in the *Stearns* Action complaint spanned the continuous time period from 1987 through 2005, a period of eighteen years," while Arrowood insured Select Comfort for only the two years from 2001 through 2003. Running the numbers, then, Arrowood contends that it "should only have paid Select Comfort no more than 2/18ths of the settlement," rather than the 33% it did pay. Therefore, Arrowood claims, it "is entitled to reimbursement from Select Comfort for some or all of the [amount it] overpaid in indemnity costs for the *Stearns* Action settlement."[2]

As the party moving for summary judgment on this claim, Select Comfort bears the burden of "show[ing] that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In this posture, the evidence and all reasonable inferences are viewed in the light most favorable to Arrowood, the nonmoving party. *E.g., Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 680 (8th Cir. 2012).

Select Comfort's motion turns in large part on the nature of Arrowood's claim. The Court therefore starts there.

---

[2] The amount Arrowood paid towards the *Stearns* settlement did not exceed the limits set in the two CGL policies.

### A. Pro rata time on the risk allocation.

The source of Arrowood's claimed right to obtain reimbursement from its insured is not clear from the pleading.[3] But Arrowood has, in its opposition to Select Comfort's motion, clarified its position that its

> right of reimbursement lies in equity. More specifically, the Minnesota Supreme Court, in this context, has abrogated the insurance policy contract requirement that Arrowood to [sic] pay 'those sums' to which its insured may become liable . . . and modified it by imposing only a pro rata coverage allocation scheme [with] each insurer providing coverage for claims occurring over a period of time. . . . Minnesota has created and has grafted an equitable remedy upon insurance policy terms that obligate insurers to pay 'all sums.' This equitable pro rata scheme necessarily extends to Arrowood's request for reimbursement, through its Counterclaim in this case.

Arrowood thus rests its claim to reimbursement from Select Comfort on its view that the Minnesota Supreme Court has "abrogated" the indemnification terms that the parties agreed to in the two CGL policies and replaced them with the "equitable remedy" of pro rata apportionment according to Arrowood's "time on the risk." This is simply incorrect.

The seminal Minnesota case on "pro rata time on the risk" allocation is *Northern States Power Co. v. Fidelity and Casualty Co. of New York*, 523 N.W.2d 657 (Minn. 1994), which was brought as a declaratory judgment action by the plaintiff utility against thirteen of its insurers. Northern States Power ("NSP") had been ordered by the Minnesota Pollution Control Agency to pay the environmental clean-up costs for soil and groundwater contamination at the site of a coal-gas facility it had operated decades earlier. *Id.* at 658-59. NSP sought indemnification for those costs under a series of liability policies it had held spanning the period in which the contamination apparently occurred. *Id.* at 659-60. Under the language of each policy, the

---

[3]   The parties both apply Minnesota law to Arrowood's counterclaim. *See Progressive Northern Ins. Co. v. McDonough*, 608 F.3d 388, 390 (8th Cir. 2010) ("Minnesota law applies, as Minnesota is the forum state and neither party has raised a choice-of-law claim.").

insurer was obligated to pay "*all sums* which [NSP] shall become legally obligated to pay because of injury to or destruction of tangible property" occurring during the policy period. *Id.* at 659.

The scenario thus presented the courts with an evident difficulty: each consecutive policy made the insurer responsible only for damages attributable to the pollution that occurred during that policy period, yet the "progressive nature of the environmental harms in question" and the "indivisib[ility]" of the injury to the property made "allocating damages to each policy 'as proven' . . . . administratively difficult, scientifically impossible, or both." *Id.* at 663 (quotation omitted).

After considering "the policy language, parties' intent or reasonable expectations, canons of construction and public policy," the Minnesota Supreme Court endorsed the allocation of liability among NSP's insurers according to their "pro rata time on the risk." That decision was not an "abrogation" of the policies' indemnification provisions; it was an application of them to the particular circumstances at hand. Indeed, the court explicitly limited the use of "time on the risk" allocation to "contamination case[s]" where the pollution can be assumed to have been "evenly distributed (or continuous) through each policy period from the first point at which damages occurred to the time of discovery, cleanup or whenever the last triggered policy period ended." *Id.* at 661, 663. In other words, where damages are indivisible and evenly distributed across a number of policy periods, allocating liability to each insurer according to the proportion of time during which its insurance was in effect holds the insurer to precisely what it contractually agreed to do in each policy: indemnify the insured for the property damage that occurred during the policy period.

Allocation by an insurer's "pro rata time on the risk" thus has a rather narrow application. *See id.* at 660-61, 664 ("Environmental liability insurance cases create special problems for litigants and courts [and] raise a variety of issues, such as . . . what method of allocation between successive insurers is most appropriate . . . . [W]e have determined the appropriate method of allocating damages *in these types of cases* . . . .") (emphasis added). That narrowness has been confirmed in a series of decisions following on *Northern States Power*. *See, e.g., Domtar, Inc. v. Niagara Fire Ins. Co.*, 563 N.W.2d 724, 733 (Minn. 1997) ("It is only in those difficult cases in which property damage is both continuous and so intermingled as to be practically indivisible that *NSP* properly applies.").

Perhaps of some particular relevance among those cases, the Minnesota Supreme Court has expressed skepticism that the "pro rata time on the risk" method could properly be used to allocate liability among insurers for property damage caused by water intrusion and mold in recently-constructed homes. *Wooddale Builders, Inc. v. Maryland Cas. Co.*, 722 N.W.2d 283 (Minn. 2006). The court noted that it "ha[s] held that the pro-rata-time-on-the-risk method applies when damage is continuous and does not arise from a discrete and identifiable event," while, "[a]rguably, the damage to the homes is traceable to a discrete and identifiable event, such as installation of the windows, installation of the flashing, or the application of the building paper." *Id.* at 289 n.1, 291 n.6. The court has also rejected "time on the risk" allocation where the leakage of silicone gel from breast implants was alleged to have caused autoimmune diseases, because those injuries could be traced to the discrete event of the implantation itself. *In re Silicone Implant Ins. Coverage Litig.*, 667 N.W.2d 405, 416-17 (Minn. 2003).

The Minnesota courts have thus been clear that "allocation is meant to be the exception and not the rule" in Minnesota, and reserved for only the "difficult cases" in which a "discrete

10

originating event" for a "continuous injury" cannot be identified. *Id.* at 421 (quotation omitted). It is not immediately apparent that the *Stearns* action, involving claims that the plaintiffs experienced health problems allegedly caused by mold in Select Comfort's products, is such a case. With that said, Select Comfort has not challenged this premise of Arrowood's "reimbursement" claim here.

### B. Cause of action for reimbursement.

Instead, Select Comfort asserts in its summary judgment motion that Minnesota does not recognize a cause of action by which Arrowood could seek reimbursement for having paid more towards the *Stearns* settlement than it would allegedly owe under a "pro rata time on the risk" allocation, even assuming that it applies. The threshold legal question, then, is as follows: Under Minnesota law, where an insurer and its insured have divided a settlement between themselves in order to dispose of an underlying suit, may the insurer thereafter petition a court to re-apportion that settlement between itself and the insured?

As explained below, the answer to that question is a qualified yes. But the cause of action that is potentially available to an insurer in this scenario does not lie in equity, as Arrowood contends; it lies in contract.

#### 1. Equity.

It is a fundamental principle of Minnesota law that the relationship between an insurer and its insured, including the extent of the insurer's obligation to indemnify the insured, is a matter of contract:

> As [the Minnesota Supreme Court] ha[s] recognized, an insurance policy is a contract between insurer and insured. . . . Because the relationship between

11

> insurer and insured is contractual, the parties are free to contract as they desire and, so long as coverage required by law is not omitted and the provisions in the policy do not contravene applicable statutes, the extent of the insurer's liability is determined by the insurance contract.

*Travelers Indem. Co. v. Bloomington Steel & Supply Co.*, 718 N.W.2d 888, 895 (Minn. 2006). As discussed above, the Minnesota Supreme Court has not abandoned this principle with its *NSP* line of cases. To the contrary, those decisions are explicitly rooted in contract law.

That issue aside, at oral argument Arrowood likened its "equitable reimbursement" claim against Select Comfort to a cause of action in equity for post-judgment contribution. *See generally Hendrickson v. Minnesota Power & Light Co.*, 104 N.W.2d 843, 846 (Minn. 1960) (discussing contribution and indemnity as "variant remedies used when required by judicial ideas of fairness to secure restitution"). But the analogy does not hold.

Under Minnesota law, "[c]ontribution, as an equitable doctrine, requires only that persons under a common burden share that burden equitably." *Peterson v. Little-Giant Glencoe Portable Elevator Div. of Dynamics Corp. of Am.*, 366 N.W.2d 111, 116 (Minn. 1985). As such, "[t]he very essence of the action of contribution is common liability." *American Automobile Ins. Co. v. Molling,* 239 Minn. 74, 76, 57 N.W.2d 847, 849 (1953) (quotation omitted). And "[s]imply stated, common liability means that each party, by reason of his wrongful act, is made legally liable to respond in damages to the injured party." *Farmers Ins. Exchange v. Village of Hewitt*, 143 N.W.2d 230, 234 (Minn. 1966).

Thus, an action for contribution may lie in some circumstances among co-insurers. For instance, because there is "a common liability among all of the primary insurers that have a duty to defend" an insured, an insurer that provides the defense while others refuse may have a "right to contribution from other primary insurers that have a duty to defend." *Cargill, Inc., v. Ace*

*American Ins. Co.*, 784 N.W.2d 341, 351-53 (Minn. 2010) (noting also that "breach of a duty to defend precludes" an insurer's right to equitable contribution).

But it does not follow that there is a common liability here between Arrowood, the insurer, and Select Comfort, the insured, such that an equitable claim will lie.  While Select Comfort is liable to the *Stearns* plaintiffs for allegedly causing their injuries, Arrowood is not; it is liable to Select Comfort for indemnification under the terms of the insurance policies.[4]  *See Morris v. American Family Mutual Ins. Co.*, 386 N.W.2d 233, 237 (Minn. 1986) ("[I]t is well settled in [Minnesota] that an injured third party claimant is not privy to the insurance contract and cannot sue an insurer directly for failure to pay a claim but must first obtain a judgment against the insured.").

Whatever right Arrowood could have to "reimbursement" from Select Comfort, then, does not sound in equity.

### 2. Contract.

What is left, of course, is contract.  The subject matter of Arrowood's claim against Select Comfort is the amount it owes in indemnification for the *Stearns* settlement.  And in Minnesota, as noted, "the extent of the insurer's liability is determined by the insurance contract."  *Travelers*, 718 N.W.2d at 895.  *See also U.S. Fire Ins. Co. v. Minn. State Zoological Bd.*, 307 N.W.2d 490, 497 (Minn. 1981) ("[E]quitable relief cannot be granted where the rights of the parties are governed by a valid contract."); *Schimmelpfennig v. Gaedke*, 27 N.W.2d 416, 420 (Minn. 1947) ("[W]here there is an express contract, there can be no contract implied in fact or quasi contractual liability with respect to the same subject matter.").

---

[4] While Arrowood asserts that it "overpaid" for the *Stearns* settlement, it does not argue that it owes no indemnification to Select Comfort under the terms of the two CGL policies.

The contracts that Arrowood entered into with Select Comfort – the two CGL policies – obligate Arrowood to "pay those sums that [Select Comfort] becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' . . . caused by an 'occurrence' that takes place in the 'coverage territory' . . . during the policy period."[5] The policies also obligate Arrowood and Select Comfort to "cooperate . . . in the . . . settlement" of a claim against Select Comfort that falls within that coverage. But the contracts contain no provision, and contemplate no ground, on which an amount paid by Arrowood in fulfillment of those obligations could later be extracted from Select Comfort and returned to Arrowood.

Nonetheless, there is no legal obstacle to the parties subsequently agreeing to condition Arrowood's participation in the *Stearns* settlement on a later suit for re-apportionment. *See generally Gossman v. Gossman*, 847 N.W.2d 718, 725 (Minn. Ct. App. 2014) (discussing modification of written contracts). And in fact, the Minnesota Supreme Court has entertained a lawsuit where two parties divided the settlement of the underlying lawsuit between themselves on the condition that they later try the issue of apportionment to a court. *Lametti v. Peter Lametti Const. Co.*, 232 N.W.2d 435 (1975). In that case,

> [a]t the time of settlement, [the underlying plaintiff] demanded a total amount of $150,000 and refused to release either party until that demand was met. [The insurer of one of the underlying defendants] advanced $100,000 toward the amount, expressly conditioning its payment on [its insured's] behalf on the preservation of his right to proceed against [the other underlying defendant] and its insurer [for reapportionment]. The stipulation indicates that [that defendant] understood and agreed to the condition, and the trial court accordingly dismissed the cross-claims without prejudice to the right of either [underlying defendant] to proceed against the other.

*Id.* at 439.

---

[5] An "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

Critically, both parties agreed to that arrangement. Indeed, the Minnesota Supreme Court has long held that, under fundamental contract principles, "[m]utual consent of the parties is always essential to a modification of a[n insurance] contract, and it is incumbent upon the party, who asserts that there was a modification to prove that the other party consented thereto." *Shake v. Westchester Fire Ins. Co. of New York*, 196 N.W.804, 805 (Minn. 1924). *See also Warrick v. Graffiti, Inc.*, 550 N.W.2d 303, 308 (Minn. Ct. App. 1996) (holding that "consent is a necessary element to modifying an effective [insurance] policy" and "an insurer may [not] unilaterally change the terms and conditions of a policy that has already taken effect").

Consistent with this requirement, the Eighth Circuit has determined that an insured may not be made to reimburse the insurer for defense costs where the insured did not agree to such a condition on the insurer's contractual duty to defend:

> [A]lthough Minnesota appellate courts have not announced whether they would permit a right of reimbursement [of defense costs from the insured], we find the most recent state and federal court decisions' adoption of the minority position [finding no right of reimbursement] more persuasive. Here, [the insurer] could have included in the policy an express provision for such reimbursement. [The insurer] cannot now unilaterally amend the policy by including the right to reimbursement in its reservation-of-rights letter.

*Westchester Fire Ins. Co. v. Wallerich*, 563 F.3d 707, 719 (8th Cir. 2009).

Here, then, Arrowood may only maintain its counterclaim if it can show a genuine issue of material fact with respect to whether the parties mutually agreed that Arrowood's payment towards the *Stearns* settlement was subject to a right of reimbursement from Select Comfort.

**C. Facts.**

It cannot.  There is no evidence in the record before the Court that Select Comfort consented to any such condition, nor even that Arrowood ever sought such consent from Select Comfort.

In this respect, Arrowood does point to the reservation of rights letter that it sent to Select Comfort at the outset of the *Stearns* case in 2008, more than four years before settlement was reached.  In that letter, Arrowood asserted a right to choose Select Comfort's defense counsel, while also asserting a

> right to seek reimbursement of any defense costs or indemnity payments [Arrowood] makes to defend, settle, or extinguish noncovered claims or liability. . . . This means Arrowood may advance legal fees, court costs, expert expenses, settlement payments, or payments to satisfy a judgment, and then seek reimbursement of such sums from Select Comfort on the ground that it had no obligation to make those payments in the first place.

But Arrowood has offered no evidence that Select Comfort agreed to any of the terms set forth in the letter, including this one.  To the contrary, it is undisputed that Select Comfort *rejected* the position Arrowood took in the letter, retaining counsel of its own choosing from Oppenheimer and demanding payment in full of the resulting defense costs.  On this record, the Eighth Circuit's conclusion in *Westchester Fire* carries equal force here in the context of indemnification.  Arrowood cannot create a right to reimbursement from its insured by unilateral declaration.

If that were not enough, Select Comfort has offered evidence of its own to show that Arrowood itself regarded its payment towards the *Stearns* settlement to be a complete and final satisfaction of its indemnification obligation.  Arrowood does not dispute any of this evidence, which is as follows.

16

In August of 2011, Arrowood's claim handler wrote the following notes from a telephone conference with Select Comfort's Oppenheimer attorneys:

> Oppenheimer opined its main reason for requesting phone conference was to determine expectations at settlement negotiations – would Arrowood seek to prevent or in any way stand in the way opf, [sic] settlement at the mediation. Michael [Barnes, Arrowood's outside coverage counsel] and I both concurred that would not be our purpose for attending. It would be counterproductive to objective of reaching a full & final resolution. . . . Michael and I agree that cost of defense ongoing is basis to get matter fully resolved.

The mediation took place in May of 2012. According to the affidavit of Select Comfort's lead defense counsel in the *Stearns* matter, it "resulted in a settlement agreement [that] "called for Select Comfort and Arrowood to pay plaintiffs a single lump sum . . . ." Arrowood and Select Comfort both agreed to that resolution, "in part due to the fact that the cost of defending these claims through trial could greatly exceed [that] amount." Furthermore,

> [d]uring the course of the mediation, and before any settlement had been reached, Arrowood and Select Comfort negotiated an agreement through the mediator regarding the share of the settlement payment that each party would agree to fund. Select Comfort notified the mediator at the outset of this negotiation that it was willing to negotiate the proper settlement allocation with Arrowood, so long as it was understood that Select Comfort was not thereby waiving its right to reimbursement from Arrowood for its unreimbursed defense costs relating to the *Stearns* Action.
>
> . . . With the assistance of the mediator, the parties quickly agreed to allocate 33% of the settlement amount to Arrowood and 67% to Select Comfort.
>
> . . . At no point in time, either before, during or after the *Stearns* settlement was reached, did Arrowood or its counsel indicate to me that Arrowood intended to seek reimbursement from Select Comfort for Arrowood's contribution to the *Stearns* settlement. Nor did Arrowood or its counsel indicate to me that Arrowood intended for its settlement contribution to be subject to the terms of any prior reservation of rights. Arrowood also never requested Select Comfort's agreement that the tender of Arrowood's settlement check would not constitute an admission of coverage under the Arrowood policies.

Arrowood does not dispute any aspect of this account.

After the settlement was reached, Arrowood's claim handler noted:

17

> Settlement check processed this morning . . . in payment for: full settlement payment of Arrowood share of final resolution amount . . . . Payment is distributed and will close both of the 2 claim files for this loss at check release.

In sum, the undisputed facts show that the parties negotiated the division of the *Stearns* settlement between themselves.  Arrowood agreed to, and did, pay 33%.  There is no evidence that Arrowood conditioned that payment on a subsequent re-apportionment of the settlement between itself and Select Comfort, much less that Select Comfort assented to such an arrangement.

Select Comfort's motion for summary judgment on Arrowood's counterclaim is therefore granted.

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1. Plaintiff's Motion to Exclude Opinions of John S. Pierce Regarding Block-Billing [ECF No. 141] is DENIED.

2. Plaintiff's Motion for Summary Judgment on Defendant's Counterclaim [ECF No. 159] is GRANTED.

Dated: December 12, 2014                    s/Joan N. Ericksen
                                            JOAN N. ERICKSEN
                                            United States District Judge